Filed 5/1/14  In re D.H. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>KIMBERLY G.,<br><br>  Defendant and Appellant. | F067787<br><br>(Super. Ct. No. 0093668-2)<br><br>**OPINION** |

<u>**THE COURT**</u>*

APPEAL from an order of the Superior Court of Fresno County.  Mary Dolas, Commissioner.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

---

*        Before Levy, Acting P.J., Kane, J. and Franson, J.

Kevin Briggs, County Counsel, William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Kimberly G. (mother) appeals from an order made at the August 5, 2013, Welfare and Institutions Code section 388[1] hearing.  Mother contends that, in its order, the juvenile court erroneously delegated authority to the Fresno County Department of Social Services (the Department) over her visits with her daughter D.H.  We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

*Section 300 Dependency Petition*

Eleven-year-old D.H. came to the attention of Santa Clara social services in April of 2012, when mother was arrested in Santa Clara County for being under the influence of methamphetamine while driving with D.H. in the car.  A petition pursuant to section 300, subdivisions (b) and (g) was filed on April 10, 2012.  When mother was arrested, there was no alternate caretaker available for D.H.  Mother had untreated mental health issues and told the arresting officer that she was Jesus and that she was running from the devil who was trying to kill D.H.  Mother had received voluntary family maintenance services from 2002 to 2009, due to substantiated general neglect.  She had a history of substance abuse for which she received treatment after serving a prison term, but the problem was ongoing.  Mother's parental rights to two other children were terminated in 2001.  The whereabouts of D.H.'s father (father) was unknown.

At the time of mother's arrest, D.H. was "very thin, gaunt and tired."  She said she had not attended school in a very long time.  D.H. was worried about mother because she seemed very sad.  D.H. appeared to be developmentally delayed, had a speech impediment which made her difficult to understand, and she did not know how to read.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2.

D.H. had an "Individualized Education Plan" due to her delays and autistic-like features and behaviors.

The section 300 petition was amended on April 18, 2012, to include information that mother had another child being raised by that child's father; that father had a criminal and substance abuse history; that father knew D.H. was not safe in her mother's care but failed to take protective measures on her behalf; and that father had not seen D.H. for over a year.

*Jurisdiction Report*

The report prepared in anticipation of the jurisdiction hearing to be held in May of 2012, stated that D.H. was in a confidential foster home, she was receiving nutritional supplements, and she was working on her numbers and letters and was able to begin school. D.H. had had a possible seizure at school. D.H.'s parents divorced in 2005.

Prior child welfare history for mother included a 1990 accident in which mother was the passenger in a car driven by a boyfriend who was driving drunk. Mother had been holding her two-year-old daughter Crystal on her lap at the time and the child died from injuries sustained in the accident. In 1992 mother was placed in a psychiatric 5150 hold. Between 1992 and 1998, there were numerous reports involving mother's daughters Alexandra and Vanessa, most on them unsubstantiated or unfounded. In 1999, a petition was sustained regarding Alexandra, due to mother's drug use and threat to kill herself. Alexandra was later adopted by a family member.

Between 2008 and 2010, four allegations of physical abuse of D.H. by mother and allegations of sexual abuse were evaluated and found to be inconclusive or unsubstantiated. Mother received family maintenance services in 2009 for being under the influence and for problems providing D.H. with mental health and educational services. Mother's criminal history included charges of driving under the influence, possession of drugs, theft, violating probation, receiving stolen property and inflicting injury on a child.

3.

At the time of mother's most recent arrest, D.H. was not adequately dressed for the weather. When officers approached, mother tossed a brass knife with a Nazi swastika on it in the back seat of the car and attempted to run onto the highway. She was arrested for driving under the influence, resisting arrest, and child endangerment. Mother was placed in a psychiatric 5250 hold and diagnosed with a number of mental health issues, as well as amphetamine and alcohol dependency and drug abuse. According to mother, she had been on anxiety and sleep medication for nine years until the doctor suddenly stopped prescribing them the month prior. Mother began receiving SSI after Crystal died.

According to Alexandra, who was now an adult, she had not been able to see D.H. since 2010, when she looked "homeless" due to her clothing and lack of hygiene. Alexandra described an incident in which D.H. wanted to beat up her baby doll and repeatedly used expletives. Once placed in protective custody, D.H. displayed knowledge of topics beyond her years. She was preoccupied with the movie Nightmare on Elm Street and the character Freddy Krueger. D.H. drew pictures of nude women she saw in movies her mother let her watch. She described the aunt who adopted Alexandra as evil.

D.H.'s therapist described D.H. as "almost feral, infantile and fragile …." She was under-socialized and deprived. D.H. attended six schools in four years and never for more than six months in an academic year. She demonstrated autistic-like behaviors, though her mother was resistant to the diagnosis. D.H. was habitually truant and tardy and had not attended school since December of 2010.

According to mother, she did not currently use drugs but did drink alcohol. Father described mother as "absolutely insane," and claimed that she and her current husband (who had swastikas tattooed all over his body) threatened to kill him. Father was afraid to take custody of D.H. because he was afraid she would harm his other child.

*Jurisdiction and Transfer Hearings*

4.

On May 14, 2012, the juvenile court sustained the petition pursuant to section 300, subdivisions (b) and (g) and transferred the case to Fresno County, where mother was living. The juvenile court appointed a Court Appointed Special Advocate (CASA) for D.H., and disposition was set for September of 2012.

*September 13, 2012, CASA Report*

The CASA report dated September 13, 2012, stated that D.H. was in foster care. The CASA noted that D.H. had a large collection of paper dolls she had made and named; she was a "picky eater" and preferred the junk food her mother gave her; she used the bathroom every 20 to 30 minutes, indicating a possible urinary problem; and she tested at the first grade level of school.

The CASA described mother as mentally ill and that her visits with D.H. were inappropriate and combative. On one occasion, D.H. became extremely anxious and panicked when she saw her mother and D.H.'s heart could be seen beating in her chest. Although D.H. said she loved and wanted to be with mother, the contact resulted in heightened anxiety, panic and regression.

*Disposition Report and Hearing*

The report prepared in anticipation of disposition, recommended that mother be denied reunification services pursuant to section 361.5, subdivision (b)(10), (11) and (13).[2] The social worker opined that, while D.H. and mother had a good relationship, the relationship was not healthy. Mother exposed D.H. to a "toxic environment" and "inappropriate behavior," and that while it was the only home D.H. knew and felt comfortable in, it posed an "extreme safety concern."

---

[2] Section 361.5, subdivision (b) provides that reunification services need not be provided the parent if: (10) the parent failed to reunify with a sibling of the child; (11) the parental rights of the parent to a sibling of the child have been permanently severed; and (13) the parent has a history of chronic or abusive drug or alcohol use.

On one supervised visit, the social worker had to redirect mother from talking about traumatic events in her life. The therapist who supervised five visits between mother and D.H. reported that mother interacted in a positive and loving manner with D.H. and learned new skills and set boundaries when they were modeled for her.

At the disposition hearing, D.H. was removed from the custody of mother and father. Reunification services were ordered for father, but denied for mother. The juvenile court subsequently terminated services to father after he waived them.

*March 15, 2013, CASA Report*

The CASA report of March 15, 2013, stated that, while D.H. was in temporary foster care because her regular care provider was out of the country, she kicked walls, plunged pencils into paper and furniture, shouted profanities, and behaved violently with small children. D.H. had not yet received a formal diagnosis and lacked appropriate special needs services and support. She was unable to maintain reasonable personal relationships and posed a threat to small children and animals. At one point, she dropped a dog on the floor and broke its leg, but displayed no feelings. After nine months with her care provider, she was beginning to show flashes of empathy and compassion to animals and people. She was beginning to learn hygiene practices.

During a psychological evaluation, D.H. demonstrated a flat effect and was irritable and noncompliant. She stabbed a pencil through the test protocol and into the wall "while laughing maniacally" and was unresponsive to directions to stop. She was reported to be aggressive with her sibling during a visit with father and father excused himself from further visits with her. The CASA recommended mother's visitation be tapered back to bi-weekly and then monthly.

*Review Reports and Hearings*

A report prepared in anticipation of the review hearing described mother as being under the influence or experiencing withdrawal symptoms during visits, as she was hyper talkative, easily distracted and agitated, and stated she was "sick" and needed medication.

6.

The social worker recommended scheduling D.H.'s therapy for the day after her visits with mother to assess how the visits were affecting her, but the visits occurred on Fridays and the foster mother and CASA requested that D.H. be allowed the weekend to recuperate before school on Mondays. The social worker suggested the visits continue but decrease, due to mother's "suspicious" behaviors.

An addendum report prepared in anticipation of the review hearing stated that, during a psychological examination, D.H. was found to have several social behaviors contrary to a diagnosis of autism. Instead, she was diagnosed with "R/O Emotional Disorder NOS, R/O Attachment Disorder. …Cognitive Functioning in the Significantly Delayed Range with Adaptive Behaviors in the Borderline to Low average range …. R/O Mild Mental Retardation. …Sensory Integration Issues." The doctor recommended a more complete psychological evaluation to assess for emotional issues, to consider a referral for an occupational therapist, to reassess in two years, and other supportive psychological and social supportive services.

D.H.'s therapist recommended reducing mother's visits if her long-term permanency goal did not include reunification. The therapist thought weekly visits had a negative impact on D.H.'s emotional health and may have triggered some of her negative behaviors towards others, as evidenced by reports from teachers and care providers.

The Department continued to assess the most appropriate plan for D.H., which at this point was a planned permanent living arrangement.

The juvenile court ordered a full psychological evaluation to assess D.H. for possible reactive detachment disorder or posttraumatic stress disorder and any resultant recommended treatment. It also ordered an occupational therapy exam to address possible sensory integration issues, as well as a psychiatric medication evaluation to address possible anxiety. Mother opposed giving D.H. psychotropic medication, but the juvenile court ordered them. Mother's visits were reduced to twice a month.

*Section 388 Petition*

Shortly after mother's visits were reduced, D.H.'s attorney filed a section 388 petition and requested that the juvenile court follow D.H.'s therapist's recommendation to suspend visits between D.H. and mother, until mother could be further assessed. According to the therapist, mother was late eight times to visits and failed to attend four visits since August of 2012. In April of 2013, mother reported the foster parent was raping D.H. On another occasion, mother stated that she believed D.H. was being harmed, but she did not want to say that out loud because then it would be true. Mother did not want D.H. in her current placement, but wanted her back in her own care. Mother said she was going to make it happen and, if anyone tried to stop her, she would call the National Guard and the police. The therapist contacted the social worker, who cancelled the upcoming visit out of concern and recommended the visits be suspended or discontinued until social services could further assess the safety of the visits.

According to the supervised visitation therapist, there did not appear to be an emotional benefit to continuing visits between D.H. and mother, due to mother's missed visits and odd behavior. The therapist opined that D.H.'s symptoms would likely increase if she continued to be exposed to mother's mental health issues. The therapist did not think there was any mental health benefit to D.H. to continue visitation at this time and she did not anticipate any significant emotional detriment to discontinue them. D.H. had been referred for a neuropsychological evaluation.

*Interim Order*

On May 30, 2013, the juvenile court issued an interim order suspending mother's visitation.

*CASA Addendum Report*

The report prepared by the CASA stated that the foster parent was frustrated and angry at the continued lack of targeted and adequate services for D.H.'s significant special needs. Both the CASA and foster parent agreed that D.H. needed to be tested for Autism and Asperger's Syndrome, but that others focused on "trauma-related behaviors."

According to D.H.'s care provider, caring for her was all consuming. No one else could manage her constant and extreme behaviors. The care provider would not be able to keep D.H. much longer unless the Department thoroughly addressed her special needs.

While D.H. continued to mention that she missed her mother, she did so less frequently. Her behaviors had improved and she was not as anxious as she had been. D.H. did worry about mother and wanted to help her stop drinking and using drugs. The CASA opined that D.H. needed to be protected from further psychological and emotional harm caused by mother's visits.

On July 8, 2013, the juvenile court ordered another temporary order suspending mother's visits.

*Section 388 Reports and Hearing*

An addendum report prepared in anticipation of the section 388 hearing stated that, according to the therapist, while D.H. loved her mother and wanted to visits her, she had a tendency to worry about her and she became "parentified" in some aspects, which was unhealthy. The therapist opined that visitation could be reestablished if mother got to a place where she was emotionally present and stable.

Both the CASA and care provider supported visitation with mother if both D.H. and mother had appropriate services to deal with their issues.

D.H. was diagnosed with posttraumatic stress disorder with dissociative features, attention deficit hyperactive disorder, moderate language/speech disorder, and insomnia. The psychologist opined that D.H. could benefit from contact with mother, especially since adoption was not being considered. The psychologist recommended "parent/child therapy be the appropriate intervention for D.H. to have more quality time with her mother and have a licensed clinician to monitor and intervene effectively."

Mother was not present at the August 5, 2013, contested section 388 hearing, but mother's counsel objected to the proposed change order.

The juvenile court questioned counsel for the Department as to whether the determination of if and when to resume visits was going to be up to the therapist. Counsel stated that the therapist would be "one voice in that conversation," but that the Department wanted to ensure that D.H. was doing well and was stable before resuming visits. Counsel also stated that, while the therapist would be meeting with mother to determine if she believed it was appropriate to go forward with visits, the Department would continue to do its own assessment with regard to mother as well. The Department wanted to ensure that mother have her "mental health and her behavior more under control."

The juvenile court then granted the section 388 petition and ordered visits between mother and D.H. suspended, finding it was in D.H.'s best interest to do so. The juvenile court authorized the Department "discretion for third-party supervised visits, including therapeutic supervised visits. [¶] Department to provide notice and any further discovery prior to proceedings and that all parties are aware that the visits are resuming and the nature of those visits and who's supervising those visits." The juvenile court then reiterated, "Ten-court-day notice and updated discovery, again, as to visits resuming, whose visit, who's supervising, and the nature of those visits, including notice to the [CASA] …."

This appeal followed.

## DISCUSSION

Mother contends that the juvenile court abused its discretion by improperly delegating authority to the Department to determine whether visitation should occur. We disagree.

In a dependency case, the juvenile court has the sole power to determine whether visitation will occur. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009.) Apart from the decision to allow for visitation itself, the juvenile court may delegate all other aspects of managing the details of the visits to social services. (*In re C.C.* (2009)

10.

172 Cal.App.4th 1481, 1489; *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373-1374, 1376-1377.)  In making visitation orders, a juvenile court can properly delegate "the ministerial tasks of overseeing the right as defined by the court.…  Such matters as time, place and manner of visitation do not affect the defined right of a parent to see his or her child and thus do not infringe upon the judicial function." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)  "Only when a visitation order delegates … the absolute discretion to determine whether any visitation occurs does the order violate the statutory scheme and separation of powers doctrine." (*In re Moriah T., supra,* at p. 1374.)

We review a juvenile court's visitation ruling for an abuse of discretion.  (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 699, fn. 6.)

In arguing that the juvenile court's delegation of authority to the Department was improper, mother relies on *In re Donnovan J.* (1997) 58 Cal.App.4th 1474 (*Donnovan J.*).  In *Donnovan J.*, at page 1477, the juvenile court ordered that "[f]ather has 'no visitation rights without permission of minors' therapists.'"  The appellate court concluded that the order was an improper delegation of judicial power.  The court reasoned: "[the order] neither requires that the therapists manage visitation ordered by the court, nor sets criteria (such as satisfactory progress) to inform the therapists when visitation is appropriate.  Instead it conditions visitation on the children's therapists' sole discretion.  Under this order, the therapists, not the court, have unlimited discretion to decide whether visitation is appropriate.  That is an improper delegation of judicial power.  Although a court may base its determination of the appropriateness of visitation on input from therapists, it is the court's duty to make the actual determination." (*Id.* at pp. 1477-1478.)

*Donnovan J.* is distinguishable.  Foremost, unlike *Donnovan J.*, the juvenile court here did not give the Department unlimited discretion to decide whether visitation was appropriate.  (*Donnovan J., supra,* 58 Cal.App.4th at p. 1477.)  Instead, the juvenile court

itself suspended further visitation, finding it was in D.H.'s best interests to do so. It then gave the Department discretion to permit resumption of third-party supervised visitation if and when it was appropriate. By doing so, the juvenile court restricted visitation to when the Department, with the help of the therapist and with notice to all parties, determined mother and D.H. had progressed to a point where supervised visitation was again beneficial.

We also note another distinction between *Donnovan J.* and the case here. In *Donnovan J.* the juvenile court's delegation was to a private therapist rather than to a social services agency. As stated in *Donnovan J.*, "A court's delegation to a private therapist, as in this case, raises additional concerns. Unlike a child protective services agency, a private therapist is not statutorily bound to 'act as a cooperative arm of the juvenile court.' [Citation.] A private therapist is not accountable to the court in the same manner as a child protective services agency." (*Donnovan J. supra,* 58 Cal.App.4th at p. 1476.) Here the delegation was to the Department, which was a cooperative arm of the juvenile court.

Even assuming arguendo that the order delegated too much judicial discretion to the Department, we find mother is not prejudiced thereby. Mother does not challenge the sufficiency of the evidence supporting the order suspending visitation and, given the substantial evidence before it, the juvenile court could have simply suspended mother's visits. "The fact that the juvenile court rejected that course, and instead issued the restrictive order challenged now, amounts to a windfall for [mother], not a violation of [her] rights." (*In re Chantal S.* (1996) 13 Cal.4th 196, 214.)

## DISPOSITION

The juvenile court's order is affirmed.